## CIRCUIT COURT OF LOUDOUN COUNTY

Terry Orr et al.

v.

National Football
League Players'
Association et al.

November 8, 1994

Case No. (Chancery) 15460

BY JUDGE THOMAS D. HORNE

This case is before the Court on the motion of certain of the Complainants for summary judgment. Terry Orr, Darryl Morrison, Mohammed Elewonibi, Earnest Byner, Kurt Gouveia, Brad Edwards, Monte Coleman, Alvoid Mays, Ray Rowe, and Brian Mitchell seek in their Amended Bill of Complaint both declaratory and injunctive relief against the National Football League Players' Association and Pro-Football, Inc., d/b/a/ the Washington Redskins. The Complainants contend that in the past, the Players' Association and Pro-Football have threatened them with suspension from play for nonpayment of union dues.

Counsel have endorsed a Pretrial Order which contains stipulated facts and documents for the Court's consideration in deciding the Motion for Summary Judgment. By such stipulation, counsel have not waived any objections which they might have, to the relevance of such facts to the issues presented. The Stipulation consists of thirty-two numbered paragraphs and incorporates various documents submitted for the Court's consideration.

Without restating in detail the contents of the Stipulation, the Court will highlight certain facts which are helpful to an understanding of its decision.

During approximately eighteen weeks of the 1993-1994 regular professional football season and approximately seventeen weeks of the 1994-1995 season, Redskin players spent and will spend the majority of their time performing their contractual obligations for Pro-Football, Inc., in the Commonwealth of Virginia.

During the 1993-1994 and 1994-1995 regular seasons, the Redskins played eight home games in the District of Columbia.

The Redskins have conducted mini-camps at Redskin Park in the Commonwealth of Virginia. A majority of the players have participated in the mini-camps. One such camp was held before the 1993-1994 season. Two mini-camps were held before the 1994-1995 season.

Three voluntary quarterback schools were held before the 1994-1995 season in Virginia at Redskin Park. A majority of the players participated in the quarterback schools.

Before the 1994-1995 season, the Redskins conducted a voluntary summer school at Redskin Park in Virginia. The majority of the Redskins participated in the summer school.

A rookie training camp was conducted at Redskin Park in Virginia from July 11 to July 24, 1994.

From about July 20 to August 17, 1994, the Redskins conducted their official preseason training camp at Carlisle, Pennsylvania. Preseason training continued in Virginia from August 19 to August 25 and from August 27 to August 29, 1994.

From approximately mid-March until mid-July of 1994, the Redskins conducted a voluntary off-season conditioning program exclusively at Redskin Park in Virginia. A majority of the players employed by Pro-Football, Inc., participated in all or part of this program.

It is possible for a player to receive his full salary whether or not he practices during the week and whether or not he is called upon to play in the regularly scheduled game for that week.

The record does not reveal (1) where all players employed by the Redskins performed conditioning work during January or February of 1994 or (2) the time which a player devoted to promotional or charitable activities at the Club's request.

Payment to players is determined in accordance with the *Collective Bargaining Agreement* between the *Players' Association* and the National *Football League Management* Council and the individual player's contract with Pro-Football, Inc.

The Stipulated Record also includes deposition testimony. In the extensive deposition record, the reader finds, in addition to numerous objections, various observations by persons intimately acquainted with the operation of the Redskins and where players work. Dan Riley, strength and conditioning coach, observed that ninety to ninety-five percent of the players live in Northern Virginia and virtually all engage in exercise at Redskin Park. Tr. 29, 88. Jason Arapoff, director of conditioning for the Redskins, noted that he expects the players, as professionals, to participate in the voluntary sixteen week conditioning program. Tr. 14, 15. Charles Casserly, General Manager of the Redskins, concluded that a Redskin player spends, on the average, six hours in the District of Columbia for each home game or a regular season total of about forty eight hours. Tr. 26.

Players' Association dues are made payable in accordance with the union security provisions of the Collective Bargaining Agreement between the Association and the National Football League owners. The players assert that their primary job situs is in the Commonwealth of Virginia; therefore, threats and demands for payment of union dues violate Virginia's right-to-work law. In order to protect their right-to-work from unlawful interference by the Association or the Redskins, the players seek a judicial declaration of their rights and protection in the form of permanent injunctive relief. *See*, § 40.1-59, Code of Virginia, as amended.

The instant Motion for Summary Judgment is, as limited by a prior decision of the court, applicable only as to Complainants Byner, Orr, Mitchell, Rowe, and Morrison.

Earnest Byner played football for the Redskins during the 1993-1994 season. He signed a contract with the Cleveland Browns in May of 1994.

Terry Orr played football with the Redskins during the 1993-1994 season. Mr. Orr initiated the present action for injunctive and declaratory relief immediately prior to the last game of the 1993-1994 season. The temporary injunction issued by the Court at Mr. Orr's request remains in effect. Although still a party to this suit, he was not re-signed by the Redskins for the current season.

Mr. Rowe participated in the 1994 official preseason training camp with the Redskins. He was released on August 23, 1994.

Brian Mitchell and Darryl Morrison participated in the Redskin preseason training camp and are employed by the Redskins for the 1994-1995 season.

Central to the controversy between the players and the Association is the union security clause of the Collective Bargaining Agreement between the National Football League Players' Association and the National Football League. The Players' Association is an unincorporated labor association representing professional football players on all of the twenty-eight franchises in the National Football League. Article V, § 1, of the Agreement provides that:

> wherever and whenever legal (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in the NFLPA, and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of the Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA, an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.

It is the declared public policy of the Commonwealth of Virginia that:

> the right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization. § 40.1-58, Code of Virginia, as amended.

Employers may not, in the Commonwealth of Virginia, require as a condition of employment, membership in a union or the payment of union dues. §§ 40.1-60, 40.1-62, Code of Virginia, as amended. An agreement which would cause an employer to violate the provisions of the right-to-work law is similarly illegal.

If the Court determines that the primary job situs of the Redskin players is within the Commonwealth, then it must declare that the union security provision of the Collective Bargaining Agreement unenforceable as to each of the Complainants. This action was initiated by Complainant Orr after the Redskins had been notified by the Association to suspend players for nonpayment of dues or the equivalent service fee. After this Court granted temporary injunctive relief to Mr. Orr, the Association has, in the discovery process, indicated that they will not seek to collect dues or the service fee from any of the Complainants for the 1993-1994 season. They have also indicated that they will not seek to suspend any players with the Redskins for nonpayment of dues or service fees for the 1994-1995 season

unless the decision of The Honorable Thomas F. Hogan, referred to *infra*, is reversed on appeal. Accordingly, should the Court find in favor of the players, it must, in addition to granting declaratory relief as to each of the five Complainants, award permanent injunctive relief as to Brian Mitchell and Darryl Morrison.

Article XXVII, Section 1, of the Collective Bargaining Agreement and Section 19 of the Player Contracts mandate binding arbitration of disputes involving both the interpretation and application of such contracts. Pursuant to the express terms of the contract, the payment of dues cannot be required as a condition of employment where such requirement would be unlawful. Any requirement of arbitration or decision of the arbitrator which would violate the public policy of Virginia would be subject to judicial scrutiny.

If the primary job situs of the players is determined to lie within the Commonwealth, the provisions of the employment contract or Collective Bargaining Agreement violative of Virginia's right-to-work law are void as against public policy and unenforceable.

The nature of the work to be performed by a professional athlete in the National Football League is determined by the contract he signs with the Club and the Collective Bargaining Agreement between the Association and the League. He is employed by the Club as a "skilled football player." By signing the contract and accepting employment on a club, a player agrees to:

> give his best efforts and loyalty to the Club, and to conduct himself on and off the field with appropriate recognition of the fact that the success of professional football depends largely upon public respect for and approval of those associated with the game. (He) will report promptly for and participate fully in Club's official mandatory mini-camp(s), official pre-season training camp, all Club meetings and practice sessions, and all pre-season, regular season, and post-season football games scheduled for or by the club. If invited, (he) will practice for and play in any all star football game sponsored by the League. (He) will not participate in any football game not sponsored by the League unless the game is first approved by the League. [Emphasis added.] N.F.L. Player Contract, para. 2.

Pursuant to the Collective Bargaining Agreement between the Association and the Club, except for mini-camps, a player is not required to attend

or participate in an off-season workout program or classroom instruction conducted by a Club. Involvement by an athlete in such an activity is both voluntary and compensated.

The majority of the Redskin football players participate in the voluntary off-season programs.

Professional football engenders tremendous public interest because of its weekly competitive contests. Without home games and perennial fan support, the survival of clubs is questionable.

However, the record reveals that without hours of practice and conditioning, professional football games could not be played. Practice for the professional football player with the Redskins consists of pre-season camps, regular season activities, and off-season conditioning. The singular location where a player spends most of his time working for Pro-Football, Inc., is at the Redskin facility located in Loudoun County, Virginia.

The National Football League Players' Association would have the Redskins suspend players who have failed to pay dues or service fees in accordance with the agency shop provisions of the Collective Bargaining Agreement with the League Management Council. The Players' Association initially found support for its position in the decision of Mr. Herbert Fishgold, the arbitrator selected in accordance with the Collective Bargaining Agreement. However, the rationale applied by Mr. Fishgold was later rejected by Judge Thomas F. Hogan of the United States District Court for the District of Columbia. Judge Hogan observed that the opinion of the arbitrator reflected a flawed interpretation of the Supreme Court precedent, contrary to the expressed public policy of the Commonwealth of Virginia.

The public policy of the Commonwealth with respect to "union shop" and "agency shop" provisions of collective bargaining agreements is clear. No employer may require union membership or the payment of union dues as a condition of employment. An employee's right to work is a matter of public concern, securely protected, and strictly enforced by civil and criminal sanctions.

Mr. Fishgold, on the one hand, and Judge Hogan and this Court, on the other, have each relied on the same case to reach differing results with respect to what is the primary job situs of the Redskin players. Justice Marshall enunciated the bright line "predominant job situs" test to resolve conflicts over the enforceability of union and agency shop dues requirements when work is conducted in both union security and right-to-work venues. *Oil, Chemical and Atomic Workers, International Union, AFL-*

*CIO v. Mobil Oil Corp.*, 426 U.S. 407, 48 L. Ed. 2d 736, 96 S. Ct. 2140 (1976). Pursuant to § 14(b) of the National Labor Relations Act, states may exempt themselves from the provisions of § 8(a)(3) of the Act and enact right-to-work laws. The Commonwealth of Virginia has made such an election.

In the instant case, Mr. Fishgold determined that the dues provisions of the Collective Bargaining Agreement were enforceable against Pro-Football, Inc., and the Redskin players. He did so based upon his conclusion that the predominant job situs of the Redskins was the District of Columbia. It was his belief that such a finding was warranted because the *raison d'etre* of the work of a Redskin player was to participate in games in R.F.K. Stadium in the District of Columbia.

Judge Hogan found, as did this Court on the Motion for a Temporary Injunction in the instant case, that the Redskins could not be compelled to suspend players for a failure to pay dues. To do so would violate the right-to-work law of the Commonwealth of Virginia and the provisions of the Collective Bargaining Agreement, that specifically exempts compliance from the provisions of the agreement where violative of state law.

The Court in *Mobil Oil, supra,* concluded that:

> [i]n light of what we understand Congress' concerns in both § 8(a)(3) and § 14(b) (of the National Labor Relations Act) to have been, we conclude that it is the employees' predominant job situs rather than a generalized weighing of factors of place of hiring that triggers the operation of § 14(b). We hold that under § 14(b), right to work laws cannot void agreements permitted by § 8(a)(3) when the situs at which all employees covered by the agreement perform most of their work is located out side of a State having such laws. At 414.

Thus, the relevant inquiry involves an examination of the contract and work performed by the players. The "predominant job situs" is that place where a player spends most of his time fulfilling his contractual obligations. Over the last nine months, the Court has permitted counsel to develop a record which would fully address this inquiry. By stipulation, that record is now before the Court.

The arbitrator gave considerable weight to that part of the *Mobil Oil* decision in which Justice Marshall refers to the predominant job situs as the place which is the very *raison d'etre* of the employer-employee-union relationship. *Id.* at 417. However, the Court believes that Mr. Fishgold

placed too great an emphasis on this use of words. Justice Marshall, in *Mobil Oil, supra,* intended that the *raison d'etre* of work, the very reason for which work is to be performed, is best determined by a quantitative analysis. Such a practical approach would eliminate the confusion which might arise from a vague or illusory standard based upon such things as income goals, tradition, and public perceptions.

The nature of the work to be performed by a Redskin player is defined by his contract. The standard player contract reflects the understanding of the Association and owners as to what may be required of an athlete and the manner in which salary and other compensation is to be paid. Each individual player contract with Pro Football, Inc., addresses a variety of activities related to the players participation in the business of the Club. The player's contract is a reflection of the fact that football is a team sport, but that individual fitness and practice are important to the game.

Contrary to the position taken by Mr. Fishgold, this Court finds that it is participation in all aspects, including practice, of the sport of football and not individual game play which is the *raison d'etre* of the relationship between employer, employee and the union. The record is devoid of any evidence which would suggest that the predominant job situs of these players is anywhere but in the Commonwealth of Virginia.

Counsel have agreed upon a Pretrial Order. Summary judgment may not be based in whole or in part upon discovery depositions unless otherwise agreed to by the parties. § 8.01-420, Code of Virginia, as amended. At the pretrial conference, the Court directed counsel to reach a stipulation as to those matters which, without waiving any objections as to relevancy, the Court might consider by way of the pending Motion for Summary Judgment. Through such a stipulation, the Record might be fully developed and the parties spared the time and expense of additional litigation. The Stipulation has been prepared and has been reviewed by the Court.

The "hours based" test to be applied in determining predominant job situs is, as applied to the facts of this case, neither vague or not susceptible of application. To the contrary, such a test avoids the vague qualities of the "weighted factors" analysis or the limitations of a "place of hiring" examination.

Counsel for the Players' Association would like to dissect the work life of a football player into its component parts. Thus, they ask that the Court determine the way in which the "hours based" test is to be applied to the various contractual obligations of the football player. The possibilities, they suggest are at least four in number. They are:

1. Is it the hours spent during the regular season?

Such an "hours based" test should be rejected as inconsistent with the work actually performed and the intent of the parties as reflected in the contract. From the training records, it is apparent that the Club places a high degree of importance upon practice and personal training at the Virginia training facility.

2. Is it the hours spent fulfilling contractual obligations year-round?

Under the "hours based" test to be employed in a predominant job situs analysis, the contract of employment must be as significant a consideration as any other. Thus, the "hours based" test relates to the yearly activities of the player. Voluntary performance of compensated off-season, seasonal, and post-season activities is an integral part of the player's job performance.

3. Is it spent engaging in activities for which the players are specifically compensated?

The "hours based" test should include not only work for which a salary is specifically provided but "voluntary" work for which compensation may also be received. It would not include individual conditioning for which there is no compensation provided.

4. Is it hours spent in compensated activity, weighted by the different rates of compensation paid?

There should be no weighing of hours. To do so would result in the use of a qualitative test, specifically rejected in *Mobil Oil*.

The hours-based test recognized by the Court relates to the contractual obligations of the player. To the extent those obligations extend beyond the regular season, total work hours must include pre-season, post-season activities, and voluntary participation in compensated off-season workouts. As noted earlier, there is a total absence of any evidence from which one might conclude more hours were spent by players in furtherance of their contractual obligations at a venue other than at Redskin Park located in Loudoun County, Virginia.

Football is a team sport. Work is performed as a member of a team practicing and performing. Practice is as integral a part of the game of football as is the performance of the team. Conditioning, in accordance with team directives, under the supervision of the team, is likewise an integral part of the game. Levels of conditioning are important to all work,

not just professional athletes. Rest, diet, personal hygiene, and a private course of daily conditioning, while important to overall performance, are not relevant to the present inquiry.

A Redskin player's primary job situs is where he spends the majority of his time working. In each case, as members of a team, that job situs is in Virginia, where most of their working hours are spent.

Accordingly, the Court finds there to be no factual issues genuinely in dispute and that this case may be decided as a matter of law on the Stipulated Record. Summary judgment will be awarded to the individual Complainants presently before the Court as to the prayer for declaratory relief. The Court will direct that the injunction be made permanent as to the two players presently playing with the Redskins.