**In the Matter of Arbitration Involving**

**SOUTHERN PACIFIC TRANS-
PORTATION COMPANY,
et al., Petitioners,**

**v.**

**UNITED TRANSPORTATION
UNION, Respondent.**

**In the Matter of Arbitration Involving**

**SOUTHERN PACIFIC
TRANSPORTATION
COMPANY, et al.**

Civ. A. No. 92–0217 (HHG).
Misc. No. 92–0047 (HHG).

United States District Court,
District of Columbia.

March 31, 1992.

Gerald P. Norton, Pepper, Hamilton & Scheetz, Washington, D.C., Dennis A. Arouca, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for petitioners.

Clinton J. Miller, II, General Counsel, Kevin C. Brodar, Associate General Counsel, United Transp. Union, Cleveland, Ohio, Joseph Guerrieri, Jr., John A. Edmond, Guerrieri, Edmond & James, Washington, D.C., for respondents.

## OPINION

HAROLD H. GREENE, District Judge.

This is a dispute between a labor union and a number of railroads[1] over the carriers' plan to reduce certain crews on their trains. An Arbitration Panel awarded to the railroads the right to reduce train crews to a single engineer and one brakeman, and it also gave the railroads the right involuntarily to buy out the remaining, surplus workers. The railroads seek to have the award confirmed and enforced pursuant to section 9 of the Railway Labor Act. 45 U.S.C. § 159. The United Transportation Union, in turn, seeks to impeach the award on the basis that the Arbitration Panel allegedly exceeded its jurisdiction and went beyond the scope of the arbitration agreement by failing to follow the solution set out in another arbitration, one involving the Chicago and North Western Railroad. The Court will confirm and enforce the arbitration award at issue and deny the unions' request for an injunction.

I

*Background*

From 1988 through 1990 the railroads and the unions attempted to negotiate modifications in pay and working conditions, but no agreement was reached. Eventually, the parties engaged in mediation under the provisions of the Railway Labor Act (hereinafter RLA), but that effort, too, failed.

On May 3, 1990, the President established Presidential Emergency Board 219 (PEB 219) to investigate the dispute and make recommendations. The Emergency Board conducted hearings in which all the parties participated. In January 1991, PEB 219 recommended specific terms for settlement, and it also fashioned a framework and procedure for arbitration and negotiation of other issues. On April 17, 1991,

---

1. Southern Pacific Transportation Co.; St. Louis Southwestern Railway Co.; Denver & Rio Grande Western Railroad Co.

eight unions, including the United Transportation Union (hereinafter UTU), struck on a nationwide basis. That day Congress passed Public Law 102–29 as a means for ending the rail strike. The following day the President signed the bill into law.

Public Law 102–29 was squarely based upon the recommendations of Emergency Board 219. The legislation transformed the recommendations of that Board into law [2] and imposed a settlement on the parties. It also established procedures, including establishment of a Special Board, by which the application of 102–29 could be clarified and modified. The Special Board was authorized under Pub.Law 102–29 to conduct hearings and to issue a report that would become binding ten days after its release.

## II

### Issues in Dispute

One of the main issues in dispute before the Special Board was the question of how many workers each crew on a train would consist. This is referred to by the parties as the "crew consist" issue.

Among its clarifications, the Special Board stated that the standard to be applied in any crew consist arbitration was the arbitration model used by Arbitration Board 509 with respect to an arbitration involving the Chicago & North Western Transportation Company, hereinafter referred to as the CNW/509 model.

The UTU has expressed its views that under that model crew reductions are to be accomplished in two steps. Initially, the crew composition would be reduced by one brakeman, this initial reduction to be a condition precedent to a further reduction to what is called "conductor-only." [3]

In December of 1991, the parties had still not reached agreement on the crew consist issue. Therefore, pursuant to the procedures of Pub.Law 102–29, a three-member

Arbitration Panel was appointed to resolve that issue. After holding hearings in Pittsburgh, the Panel issued its decision on December 31, 1991. One of the principal features of that decision is that all "through-freight, work and yard transfer trains" are to have a crew consisting of one engineer and one conductor, eliminating two brakemen positions. The award also permits the railroads involuntarily to buy out surplus workers.

In Civil Action 92–0217, the railroad carriers have petitioned for confirmation and enforcement of the award. UTU has counterclaimed and has sought an injunction, the argument being that the Arbitration Panel exceeded its jurisdiction and went beyond the scope of the arbitration agreement by failing to institute the precise solution adopted by the Arbitration Board in the Chicago & North Western dispute. In Miscellaneous No. 92–0047, UTU filed a complaint seeking to impeach the award. Consequently, the Court consolidated the cases for hearing and decision.

On March 24, 1992, the Court heard oral argument from both parties. UTU had filed for a preliminary injunction in Civil Action No. 92–0217, but pursuant to Fed. R.Civ.P. 65(a)(2), the Court consolidated the motion with a hearing on the merits, and the parties have agreed to a merits decision. The reduction in crew size pursuant to the Arbitration Panel decision was originally to take place on April 1, 1992, but the carriers informed the Court that they would voluntarily delay the decision to April 15, 1992, to afford the Court adequate time for consideration of the issues.

## III

### Meaning of the Decision in the CNW/509 Case

■ As indicated, the railroad carriers seek confirmation and enforcement of the

---

**2.** Under Pub.Law 102–29 the recommendations of Presidential Emergency Board 219 are binding on the parties as if arrived at by their own agreement under the RLA (Pub.Law 102–29 § 1), and the interpretations of the Special Board (*see infra*) are likewise binding as if

arrived at through agreement. Pub.Law 102–29 § 3(e).

**3.** "Conductor only" actually means that the crew consists of one engineer and one conductor.

award of the Arbitration Panel pursuant to section 9 of the Railway Labor Act, 45 U.S.C. § 159. That statute states that an arbitration award may be impeached only on the following grounds:

(a) that the award "plainly does not conform to the substantive requirements" laid down under the RLA or that the arbitration proceedings were not in conformity with the RLA;

(b) "That the award does not conform, nor confine itself, to the stipulations of the agreement to arbitrate;" or

(c) that a member of the arbitration board is guilty of fraud.

UTU argues that the Arbitration Panel exceeded the scope of its authority because it did not implement the two-step approach employed by Arbitration Board 509 in the Chicago & North Western dispute, and it goes on to say that, by not complying with the CNW/509 model, the arbitrators exceeded their jurisdiction. UTU's alternative argument is that the Panel's failure to comply with the CNW/509 model renders the award non-conforming to the arbitration agreement.

The central issue here is whether the language of Public Law 102–29, with the subsequent interpretations and clarifications of the Special Board, restricted the arbitrators in this dispute to precise application of the CNW/509 model.

The language directing the Arbitration Panel to use the CNW/509 model is not nearly as conclusive as UTU suggests. PEB 219 stated that, in resolving the crew consist issue, the Arbitration Panel should be "guided by" standards in those agreements which were entered into by the carriers and the UTU on properties which are contiguous with those of the involved carrier, *i.e.*, the CNW/509 agreements.

UTU subsequently sought clarification of this language from the Special Board, asking, "What consideration or weight should be given to agreements on contiguous carriers?" The Special Board's clarification stated that the PEB 219 intended that "special weight be given" to the solution of the problem with respect to the carrier contiguous to virtually all of the other ma-

jor carriers. Another reference followed UTU's request for clarification asking what "standard" should be used as a yardstick in negotiating the crew consist agreements. The Special Board replied that the standards are "those which were contained in the Report of PEB No. 213 and were utilized by Arbitration Board 509."

In the view of this Court, the words "guided by," "special weight," "standards to be used" are not rigid directives but somewhat elastic ones. They clearly do not constrain the Arbitration Panel to impose the identical terms used in the CNW/509 model; the Panel was merely to be guided by the CNW/509 precedent.

UTU argues that it was the intent of Congress in enacting Pub.Law 102–29 to avoid all involuntary buy-outs. The sole support for this argument is a portion of a colloquy on the House floor:

Congressman Bruce: ... Does the gentleman agree that in passing this legislation [Pub.L. 102–19] it is the sense of Congress that any local arbitration on crew consist issues build on the success of the $50,000 voluntary payments made and make those job losses voluntary?

Congressman Swift: Mr. Speaker, I agree that the gentleman's understanding is certainly the sense of Congress.

137 Cong.Rec. H2365 (April 17, 1991).

Taken in context, the colloquy does not support UTU's conclusion. The reference to building on the success of the $50,000 voluntary payments refers to providing a certain amount of funds to encourage voluntary settlements, *i.e.*, $60,000 for voluntary severance. The omission of a reference to involuntary severance does not suggest that involuntary buy-outs were beyond the pale of Pub.Law 102–29, as a complete reading of the pertinent debate language likewise indicates. In any event, even if the legislative history were more conclusive, a colloquy on the floor would be of uncertain weight. *Thornburg v. Gingles*, 478 U.S. 30, 43 n. 7, 106 S.Ct. 2752, 2762 n. 7, 92 L.Ed.2d 25 (1986).

## IV

### Contract and Deference

██ The Arbitration Panel had considerable discretion in interpreting any ambiguities in the arbitration agreement. *United Paperworkers v. Misco*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). While an arbitrator may not ignore the plain language of a contract, his role is to give meaning to the language of the agreement, and a "court should not reject an award on the ground that the arbitrator misread the contract." *Id.; see Hoteles Condado Beach v. Union de Tronquistas Local 901*, 763 F.2d 34, 41 (1st Cir.1985). In addition, arbitrators are commissioned to interpret and apply agreements and to use their judgment in formulating remedies. On that basis, they require flexibility in doing so. *See Steelworkers v. Enterprise Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Consequently, the scope of judicial review of arbitration awards is "the narrowest known in the law." *Maine Central R.R. v. Brotherhood of Maintenance of Way Workers*, 873 F.2d 425, 428 (1st Cir.1989).

██ UTU argues that the Court should not treat the decision of the Arbitration Panel under the deferential standard applied to the review of arbitration awards generally. Rather, says UTU, the Court should apply the standard of review utilized in *Leedom v. Kyne*, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). That decision, however, dealt with the National Labor Relations Board, a federal administrative agency, which was said to have exceeded its statutory delegation by recognizing a labor unit that included both professionals and non-professionals. The case did not involve an arbitration at all. While, to be sure, the instant case involves interpretation of Pub.Law 102–29, that law and its interpretation by the Special Board were clearly intended to be treated as if they constituted an arbitration agreement reached by the parties. As such, the decisions reached by the Arbitration Panel should be treated under the standard of review accorded rulings of arbitrators rather than that applied to federal agencies.[4]

██ Finally, it should be noted that the Arbitration Panel did use the CNW/509 model; in fact, many of the provisions from that model were incorporated by the Arbitration Panel. In some respects, the arbitrators' award deviates somewhat from the CNW/509 decision in a way that favors the railroads, in others their award deviates to favor the union. But it cannot be gainsaid that the Panel was guided by and gave special weight to the CNW/509 model.

UTU argues finally that Pub.Law 102–29 and the Special Board referred to the solution utilized on contiguous property, that is, the Chicago & North Western Railroad, because it sought uniformity in settlement among competing carriers, so as not to afford some an advantage over others, and that therefore the CNW/509 had to be adopted in toto. But the statute did not preclude the Arbitration Panel from tailoring the CNW/509 approach to the special circumstances present here, particularly since the several carriers, while contiguous, are not necessarily in direct competition with each other.

## V

### Conclusion

The Arbitration Panel did not exceed its jurisdiction. It utilized the CNW/509 approach in a manner consistent with Pub. Law 102–29 and the interpretations by the Special Board. There is no basis to impeach the award, and it will therefore be confirmed.

**4.** Even assuming, however, that a more stringent standard of review applied, the language of the Presidential Emergency Board and of the Special Board cannot be said to have so confined the Arbitration Panel that it could only replicate exactly the approach of the CNW/509 model. *See National Railroad Passenger Corp. v. Boston and Maine Corp.*, — U.S. —, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) (deference to agency interpretation of statutory language "required" as meaning "useful or appropriate").