The WASHINGTON POST, Appellant,

v.

**WASHINGTON–BALTIMORE
NEWSPAPER GUILD,
LOCAL 35.**

No. 85–5193.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1986.

Decided April 4, 1986.

Richard C. Hotvedt, with whom John A. Fraser, III, Washington, D.C., was on brief for appellant.

Robert E. Paul, Arlington, Va., for appellee.

Before ROBINSON, Chief Judge, WRIGHT, Circuit Judge, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

In this case, we must decide whether § 302 of the Labor Management Relations Act ("LMRA") precludes an arbitrator from ordering an employer to reimburse a union for dues lost as a consequence of the employer's breach of a collective bargaining agreement. The District Court upheld such an arbitration award. We hold that the LMRA does not foreclose such an award, and therefore affirm.

## I. BACKGROUND

The collective bargaining agreement at issue in this case was first negotiated in 1947. The agreement, between The Washington Post ("Post") and the Washington-Baltimore Newspaper Guild, Local 35 ("Guild") generally covered all Post employees except executives. The 1947 agreement, however, also excluded one cartoonist and one columnist from the bargaining unit.

In 1973 the Post founded a "Writers Group," consisting of both employees and non-employees. Through this organization, the Post marketed the columns of the members of the Group directly to the purchasing newspapers, rather than through intermediate syndicates. Between 1973 and 1979, both the Post and the Guild proceeded under the assumption that columnists employed by the Post whose work was syndicated through the Writers Group were part of the collective bargaining unit.

In 1979 and 1980, the Post's Deputy Managing Editor advised four Post columnists (Richard Cohen, Thomas McCarthy, William Raspberry, and Thomas Shales) that they were excluded from the bargaining unit under the collective bargaining agreement. All four employees resigned from the Guild, revoked their authorizations for the payment of union dues from their salaries, and refused to pay further union dues.

The Guild filed a grievance. On October 19, 1983, an arbitrator sustained the grievance. The arbitrator held that the collective bargaining agreement was intended only to exclude columnists who made an arrangement with the Post to have their columns published through an independent national syndicate. Thus, the four columnists, whose columns were syndicated by the Post itself, remained within the bargaining unit. As a remedy, the arbitrator ordered the Post to reimburse the Guild for its loss of dues. Arbitration Decision at 7, Appendix ("App.") at 15. This order covered the period from the date that the Post notified the columnists that they were excluded from the bargaining unit to the first day of the months following the date on which the Post notified the columnists that the original notification was in error. *Id.*

On November 21, 1983, the Post filed suit in District Court, requesting that the court vacate the arbitrator's award. On August 6, 1984, the District Court, in an unpublished memorandum opinion, granted summary judgment to the Guild, upholding the arbitration award. The Post moved to reconsider. On January 8, 1985, the District Court denied that motion, and also denied the Guild's request for attorneys' fees. This appeal followed.

## II. ANALYSIS

On this appeal, the Post does not challenge the arbitrator's substantive ruling that the columnists in question are covered by the agreement. *See* Br. for Appellant at 8. Instead, this appeal concentrates on the remedy portion of the arbitrator's decision. Specifically, the Post resists the portion of the award that requires it to pay the union dues that the columnists did not pay during the time that they were excluded

from the bargaining unit. The Post insists that this portion of the award violates § 302 of the LMRA.

■ It is by now a familiar rule that an arbitrator's award is entitled to significant deference. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960) (indicating that an arbitrator's award must be upheld so long as it "draws its essence from the collective bargaining agreement"); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Despite this rule, it is unquestionably the province of the courts to say what the law is. We need not defer to an award which contemplates a violation of law. *Washington-Baltimore Newspaper Guild, Local 35 v. The Washington Post Co.*, 442 F.2d 1234, 1239 (D.C.Cir. 1971). As the instant case presents a question of statutory interpretation, we are informed by the views of the arbitrator and District Court, but we approach the task with an awareness that the final responsibility is solely our own.

The starting point for all questions of statutory interpretation is, of course, the plain language of the provisions at issue. Section 302 of the LMRA generally forbids an employer from contributing money to a labor organization.[1] However, § 302 provides some limited exceptions to that general prohibition. One exception, § 302(c)(4), permits the "checkoff" of union dues from an employee's salary.[2] Another exception, § 302(c)(2), allows for payments in satisfaction of an arbitrator's award.[3]

Our problem lies in the intersection between these two exceptions. The Post contends that the effect of permitting the arbitrator to order the employer to pay the employees' union dues is to nullify § 302(c)(4), which permits the payment of dues only when employees have given written authorizations. On this view, the award was impermissible, since the employees had specifically revoked their authorizations for the payment of dues.

On another view of the problem, however, no conflict appears. In drafting § 302, Congress established nine alternative exceptions. If any one of these exceptions applies, the general prohibition of § 302 does not operate. Although § 302(c)(4) would not permit the payment of union dues, § 302(c)(2) would, and thus the payment is lawful. This interpretation is to be preferred as it avoids a conflict in

---

1. In § 302 of the LMRA, 29 U.S.C. § 186 (1982), Congress provided:

    (a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, advisor, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other things of value—

    (1) to any representative of any of his employees who are employed in an industry affecting commerce; or

    (2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce....

2. Section 302(c)(4), 29 U.S.C. § 186(c)(4) (1982), provides:

    (c) The provisions of this section shall not be applicable

    *     *     *     *     *     *

(4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: Provided, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner....

3. Section 302(c)(2), 29 U.S.C. § 186(c)(2) (1982), provides:

    (c) The provisions of this section shall not be applicable

    *     *     *     *     *     *

(2) with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress....

statutory provisions. *See Sutherland Statutory Construction* § 51.02 (Sands 4th ed. 1984) ("Statutes for the same subject, although in apparent conflict, are construed to be in harmony if reasonably possible.").

We hasten to add that this interpretation comports with the purpose of § 302. An important purpose of the LMRA was to prohibit special payments by employers and employer associations to employees, employee organizations, and officers of such organizations, except on conditions carefully prescribed by law. Congress expressed concern that a potential for bribery and improper influence exists whenever payments flow from an employer to a union. *See Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.,* 746 F.2d 557, 568 (9th Cir.1984) (referring to congressional purpose in enacting § 302 as "preventing corrupt bargains between unions and employers"); *International Longshoremen's Association v. Waterfront Commission of New York Harbor,* 642 F.2d 666, 671 (2d Cir.) (in enacting § 302, "Congress was taking statutory cognizance of conduct that was similar in some ways to the crime of bribery"), *cert. denied,* 454 U.S. 966, 102 S.Ct. 509, 70 L.Ed.2d 383 (1981); S.Rep. No. 187, 86th Cong., 1st Sess. at 13 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2318, 2329 (§ 302 designed to prohibit "all forms of extortion and bribery in labor management relations"). The Post suggests that this purpose requires it to avoid even the appearance of impropriety, which could develop if an employer gives money to a union. Br. for Appellant at 27–28. Even on this more extreme view, the payment of union dues in this case does not evoke the appearance of impropriety. The Post will pay this money on the order of the arbitrator, after vigorous and genuine litigation. No reasonable view of these facts suggests any improper influence.

Our interpretation of the § 302 exceptions is consistent with the treatment these provisions have received in other courts. In *United Steelworkers of America v.* *United States Gypsum Co.,* 492 F.2d 713 (5th Cir.1971), *cert. denied,* 419 U.S. 998, 95 S.Ct. 312, 42 L.Ed.2d 271 (1974), for example, the court held that an arbitrator's award requiring a company to reimburse a union for dues it had lost was lawful. In that case, United Cement Company, Inc., the owner of a lime plant, had a collective bargaining agreement with its production and maintenance employees. United sold the plant to United States Gypsum Company. Gypsum hired all but three of United's former employees, and began operating the plant, but did not check off union dues, as was required by the collective bargaining agreement. The union filed a grievance. The arbitrator held that the collective bargaining agreement was still in effect. As one part of the remedy for this violation, the arbitrator ordered Gypsum to pay the union dues that would have been collected had the company continued to check off dues from the employees' salaries. On appeal, the Fifth Circuit specifically rejected a challenge to the lawfulness of this award. "Since the purpose of § 302(a) is to protect employers from extortion and to insure honest, uninfluenced representation of employees, and in view of the exclusion from its coverage of an arbitrator's award we hold that § 302(a) does not render the arbitrator's award here unenforceable." *Id.* at 734. The Post suggests that the *Gypsum* case is distinguishable from the instant case because the Gypsum employees never revoked their dues authorizations; in contrast, the Post columnists specifically revoked their authorizations. Br. for Appellant at 25–26. No such express limitation, however, appears in the *Gypsum* court's holding.

The Post relies principally on two cases for its contention that awards of back union dues are unlawful under § 302. We find neither decision completely apposite.

In *Jackson Purchase Rural Electric Cooperative Association v. Local Union 816, International Brotherhood of Electrical Workers,* 646 F.2d 264 (6th Cir.

1981), the employer, Jackson Purchase, had a collective bargaining agreement with the union. The agreement was silent on the question of dues checkoff, but for 16 years the company deducted dues from employee paychecks and paid them over to the union without written authorization from the affected employees. Jackson Purchase unilaterally terminated this practice. The union protested and the matter was submitted to arbitration. The arbitrator concluded that even though the practice had violated federal law, it had created an implied agreement between the employer and the union which could not be unilaterally terminated. The arbitrator ordered Jackson Purchase to continue to check off union dues upon receipt of proper authorization cards from the employees. The District Court, however, set the award aside. On appeal, the Sixth Circuit held that the only implied agreement between the parties was an agreement to check off dues without written authorization. *Id.* at 267. So viewed, "[t]he arbitrator's award depended on the illegal past practice, thus was not based on the collective bargaining agreement, and the District Court was correct in setting it aside." *Id.* at 268. The *Jackson Purchase* opinion, therefore, only addresses invalid contractual provisions. The opinion says nothing about an arbitrator's power to award a union the dues it lost as a consequence of the employer's breach of a valid collective bargaining agreement.[4]

The Post also relies on *International Longshoremen's Association v. Seatrain Lines, Inc.*, 326 F.2d 916 (2d Cir.1964). In that case, a longshoremen's union had objected, during the course of collective bargaining negotiations, to the use by several employers of pre-loaded cargo containers, a form of automation which reduced the workforce. The employers agreed to pay 28 cents per gross ton of "containerized" freight handled through the Port of New York into a fund to be administered by trustees appointed by both the union and the employers. The union, however, also demanded that part of the fund be paid directly to it as compensation for its loss of revenue. The employers insisted that such a provision would be illegal and refused to negotiate. Instead, the parties stipulated that 10% of the moneys paid to the trustees would be put in escrow pending a determination by a federal court or the United States Attorney General on the legality of the payment to the union. Thereafter, the union filed suit for a declaratory judgment. The District Court dismissed the suit as not presenting a justiciable case or controversy. The Second Circuit addressed the merits of the case, and held the proposed agreement unlawful. The court noted, in particular, that the agreement could not be

---

**4.** The Post suggests that the revocations of dues authorizations by the columnists in this case were voluntary. Reply Br. at 2. The Guild insists that the arbitrator found that the revocations were a direct result of the Post's decision to exclude them from the bargaining unit. Br. for Appellee at 38. We think the Guild is correct in this regard. The arbitrator twice mentions this matter:

> The Post continued to treat these employees as within the bargaining unit at least until August 1979 when Deputy Managing Editor Harwood broached the subject to Cohen. In March 1980 Harwood discussed it with Raspberry and Shales, and in the summer of 1980 with McCarthy. In those discussions Harwood explained that the Post no longer regarded the employee in question as within the unit covered by the Agreement, but he did not otherwise exert any effort or indicate any desire to have them resign their membership

in the Guild. However, all four did stop paying dues to the Guild.

App. at 12–13. Later in his decision, the arbitrator again addresses the subject:

> As each of the four columnists in question stopped paying dues to the Guild after the Post apprised him of his exclusion from the unit, the Post should reimburse the Guild for any loss of dues.

App. at 15.

The latter reference, in particular, is a clear enough indication that the arbitrator felt that the revocations were not voluntary, at least in the sense of being initiated solely by the employees. That finding is perfectly reasonable. An employee, knowing that the company felt that he was not part of the union (and thus not eligible for union benefits) would naturally want to exclude himself from the payment of union dues.

considered a settlement of a claim within the meaning of § 302(c)(2). *Id.* at 919. In addition, the parties did not argue that the payments constituted an authorized dues checkoff under § 302(c)(4). *Id.* at 920. Thus, *Seatrain* is not to the contrary of our holding today. The *Seatrain* court was not forced to determine whether any conflict existed between § 302(c)(2) and § 302(c)(4).[5]

### III. Conclusion

The rule we adopt in this case, although novel in the sense that we have not previously addressed the question, is straightforward and grounded in practical reality. The Post, as the arbitrator found, violated the terms of the collective bargaining agreement. The Guild suffered as a consequence of that breach. The arbitrator properly determined that the Post should compensate the Guild for that breach. We hold that this award was lawful under § 302 of the LMRA. The judgment of the District Court is

*Affirmed.*

---

**5.** The Post makes much of some isolated language in the *Seatrain* opinion:

> We need not now attempt to define in detail the area in which Section 302(c)(2) affords immunity. For the present case it is sufficient that we hold that whenever some other provision of Section 302(c) provides a more particularized exception, the transaction must satisfy the requirements of that other exception to be exempt.

*Seatrain,* 326 F.2d at 920.

This portion of the opinion must be read in the context of the remainder of the opinion.

The central concern of the *Seatrain* court was that, by characterizing any agreement as a settlement of a claim, a union and an employer could effectively nullify the proscriptive effect of § 302. *Seatrain,* 326 F.2d at 919–20. In addition, as noted, the case did not directly present the question of how to resolve alleged conflicts between § 302(c)(2) and § 302(c)(4). Read in this context, we do not find this perhaps overbroad *Seatrain* comment dispositive of our case.