**PRO-FOOTBALL, INC., et al., Petitioners,**

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES (WORKERS' COMPENSATION), Respondent,**

**Stuart Anderson, et al., Intervenors.**

No. 89–958.

District of Columbia Court of Appeals.

Argued Feb. 19, 1991.
Decided March 28, 1991.

---

William S. Hopkins, Washington, D.C., for petitioners.

Gerald Herz, Washington, D.C., for intervenors.

Edward E. Schwab, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the memorandum in lieu of brief, for respondent.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

In this case we consider the consolidated claims of fourteen[1] former Washington Redskins professional football players for workers' compensation benefits as a result of injuries sustained in the course of their often heroic but always perilous employment. Pro–Football, Inc., which is the corporate name under which the Redskins trade, has asked us to review a decision by the Director of the Department of Employment Services (DOES) holding that the players' employment was principally localized in the District of Columbia, and that the players may therefore invoke the provisions of the District's Workers' Compensation Act (WCA), D.C.Code §§ 36–301, –345 (1988). Upon consideration of the entire record, we are satisfied that as to eleven of the claims, the Director's factual findings are supported by reliable, probative and substantial evidence and that his conclusions of law flow rationally from those findings. *See Eilers v. District of Columbia Bureau of Motor Vehicles Servs.*, 583 A.2d 677, 683 (D.C.1990). Accordingly, we affirm as to those eleven. We remand for further proceedings as to the remaining four.

I

The parties in this case are sharply at odds with one another regarding the "ulti-

---

**1.** There are fifteen claims before us, two by claimant Virgil Seay.

mate" facts, but the "evidentiary" facts are largely undisputed. The Redskins compete in the National Football League (NFL). They play all of their home games at Robert F. Kennedy (RFK) Stadium in Washington, D.C. The stadium, which accommodates 55,000 spectators, is leased from the District of Columbia Armory Board, a quasi-governmental agency, pursuant to the terms of a 30–year lease.

Each season, the Redskins play sixteen regular season games, eight at home and eight on the road. The team also plays a few pre-season exhibition games each year, at least one of them at RFK Stadium. If the Redskins advance to the NFL playoffs, they may play one or more post-season games at home, depending on whether they earn home field advantage. Road games are played at various other stadiums across the country. Obviously, the team plays substantially more games in the District of Columbia than in any other jurisdiction.

Robert C. (Bobby) Mitchell, a Redskin great of yesteryear who now serves as the team's assistant general manager, testified to the obvious when he described the Washington Redskins as a business whose primary purpose is to make money. In 1986, approximately 98 percent of the club's revenue was derived from ticket sales and associated amounts generated by television, two-thirds from games at RFK Stadium and the remaining one-third from road games.

The Collective Bargaining Agreement between the NFL Players Association and the league's Management Council provides that in order to be eligible for compensation under the NFL Player Contract, a player must be on the active roster during the regular season. In other words, he receives his salary only for regular season games. Although players are also required to participate in pre-season games and practices, they receive *per diem* pay rather than their contractual salary. Eligi-

bility for bonuses and other benefits is also linked to regular season play.

From mid-July to late August of each year, the Redskins train at Dickinson College in Carlisle, Pennsylvania. Thereafter, during the pre-season and regular season, the team's training facility is at Redskin Park, which is located near Dulles Airport in Virginia. The players spend approximately eight hours a day, five days a week, at Redskin Park. They come to RFK Stadium only on days when there is a home game, and then only for a few hours. It is undisputed that the amount of time spent by each player in Virginia substantially exceeds the amount spent in the District. Except for promotions, however, the Redskins generate no income in Virginia.

In response to questions by counsel for one of the players, Bobby Mitchell acknowledged that "the principal service for which [a player] is hired is to play regularly scheduled games to make money. That is why they hire a player." [2] Norman Jenkins, attorney for the NFL Management Council, likewise acknowledged that the principal performance for which a player is put under contract is to play for the team during the sixteen-week regular season.

The fourteen players whose claims have been consolidated in this appeal include four—Gerald Bullitt, Michael Newton, Jeffrey Rosen and Troy Thomas—who never played a game at RFK Stadium. All of the other claimants played games for the Redskins, both at RFK and on the road.[3]

None of the claimants lived in Washington, D.C. while employed by the Redskins. Their various injuries were sustained at different times and in different places. Most or all of the players signed their contracts outside the District. Each had a one-year or multi-year NFL Player contract with the Redskins. Section 23 of the Contract states that "[t]his contract is made under and shall be governed by the laws of the District of Columbia."

---

**2.** The quoted language was actually counsel's. Mr. Mitchell's response was "I would think so."

**3.** Robert Slater never played for the team in a regular season game, but did play during the

pre-season, both at RFK Stadium and on the road. Pre-season games are, of course, attended by fans and produce revenue for the club.

278

## II

In most of these cases,[4] the employer denied coverage on the ground that the player's employment was not principally localized in the District of Columbia, as required by D.C.Code § 36–303(a) (1988).[5] Administrative hearings were held before several DOES hearing examiners, each of whom held that the player's claim was covered. On July 7, 1989, the Director issued a decision applicable to all fifteen of the cases in which he reached the same conclusion as the hearing examiners had reached.

The Director analyzed the issue in terms of the three-part test established in *Hughes v. WMATA,* H & AS No. 83–60 (March 6, 1980), *aff'd, Hughes v. District of Columbia Dep't of Employment Servs.,* 498 A.2d 567 (D.C.1985). In *Hughes,* this court approved the agency's consideration of the following factors in deciding the location of the employment relationship:

> (1) The place(s) of the employer's business office(s) or facility(ies) at which or from which the employee performs the principal service(s) for which he was hired; or
>
> (2) If there is no such office or facility at which the employee works, the employee's residence, the place where the contract is made and the place of performance; or
>
> (3) If neither (1) nor (2) is applicable, the employee's base of operations.

*Hughes, supra,* 498 A.2d at 569.

The Director noted the employer's claim that the overwhelming majority of the players' employment-related time was spent in Virginia. Nevertheless, after considering the provisions of the Collective Bargaining Agreement and the NFL Player Contract and analyzing the sources of the employer's revenues, the Director concluded that

> claimant's employment is principally localized in the District of Columbia under prong one of the *Hughes* test, as the principal service for which claimant was

**4.** In two cases, coverage was not contested.

**5.** Section 36–303(a) provides in pertinent part: This chapter shall apply in respect to the injury or death of an employee of an employer ..., irrespective of the place where the

hired was to play in regularly scheduled NFL football games. Employer plays no games in Virginia and plays far more of these games in R.F.K. Stadium than in any other place. In addition, the Director finds that claimant's practices and training at Redskin Park in Virginia were merely preparatory to the performance of his principal services. None of claimant's principal services were provided in Virginia.

The first prong of *Hughes,* on which the Director relied, refers to the place "at which ... the employee *performs* the principal service for which he was hired." (Emphasis added). As we have previously noted, four of the claimants never played a game at RFK Stadium, nor did they perform any other service for the Redskins in Washington, D.C. The Director did not explicitly address the question whether a player who performed no services in the District was embraced within the first prong where it was merely *contemplated* that his principal service would be performed here.

## III

In the present case, as in *Bender v. District of Columbia Dep't of Employment Servs.,* 562 A.2d 1205, 1209 (D.C. 1989),

> the agency's assertion of jurisdiction is predicated on a finding that [claimant's] employment was "principally localized" in the District of Columbia at the time of his accident; a determination that the DOES is routinely called upon to make and one that demands the type of agency expertise and informed discretion that we generally show great deference towards.

Accordingly, our scope of review is narrow. We must determine whether the agency's findings are supported by reliable, probative and substantial evidence, *see* D.C.Code

injury or death occurs provided that at the time of such injury or death this employment is principally localized in the District of Columbia.

§ 1–1509(e) (1987); *Eilers, supra,* 583 A.2d at 683, and whether its conclusions of law flow rationally from those findings. *Perkins v. District of Columbia Dep't of Employment Servs.,* 482 A.2d 401, 402 (D.C. 1984). The agency's interpretation of § 36–303(a) is binding unless it is plainly erroneous or inconsistent with the language or purposes of the statute. *Lee v. District of Columbia Dep't of Employment Servs.,* 509 A.2d 100, 102 (D.C.1986). We must sustain that interpretation even if another construction may be just as reasonable as the agency's, and even if we might have reached a different conclusion had the initial decision been ours to make. *Id.*

■ We have no difficulty in concluding that, with respect to the claimants who have played for the Redskins at RFK Stadium, the Director's decision must be sustained, substantially for the reasons articulated in that decision. The testimony of Bobby Mitchell and Norman Jenkins lends further support to the finding that the principal service for which a player is hired by the Redskins is to play regularly scheduled games and earn money for the team. In the final analysis, professional athletes are entertainers. Just as an actor's rehearsals are ancillary to his performance on the stage, so a professional athlete's practice is merely preparatory to the game. At the very least, the Director could rationally so find, and we are in no position to second-guess him here. The Director's legal conclusions flow rationally from his findings, and the employer has not shown, nor can it, that the Director's construction of the statute was plainly wrong.[6]

■ The case of the four claimants who never performed at RFK Stadium is more difficult. Since they have not performed a service in the District, they do not fall within the literal language of the first prong of *Hughes* if that prong is construed as focusing strictly on actual performance.

Counsel for the employer argued to the hearing examiner that it would be "ludicrous" for jurisdiction to be found in Michael Newton's case because

> Mr. Newton is not a resident of the District of Columbia, was not hired in the District of Columbia, and performed no services for the employer in the District of Columbia. All of what [opposing counsel] has said regarding other players and what benefits they might reap in the District of Columbia has absolutely no bearing on this case.

Counsel made similar arguments in the other cases involving players who have never played at RFK Stadium, and renewed these arguments before this court.

It is not clear to us whether the Director, in ruling that the employment of all fourteen players was "principally localized in the District of Columbia" within the meaning of § 36–303(a), was implicitly holding that the word "performs" in the first prong of the *Hughes* test embraces contemplated performance as well as actual performance. Whether or not such a holding was implied, we think that the issue is sufficiently novel to warrant the Director's addressing it directly. We do not think that this court should decide the question without a clear articulation of the Director's views. Our review of the Director's interpretation must, as we have noted, be deferential, but we are not sure in this case whether the Director has decided or overlooked the narrow question presently under discussion. Accordingly, we affirm the Director's decision with respect to Stuart Anderson, David Jones, Anthony Laster, Richard Mauti, Mark McGrath, Virgil Seay (two cases), Robert Slater, Richard Walker, Michael Williams, and Otis Wonsley. We remand for further proceedings with respect to Gerald Bullitt, Michael Newton, Jeffrey Rosen, and Troy Thomas.

*So ordered.*

---

6. In *Petrilli v. District of Columbia Dep't of Employment Servs.,* 509 A.2d 629, 633 (D.C.1986), we declined to decide whether the three-part test in *Hughes* should have "universal application." The employer has not contended in this case that the *Hughes* test is inapplicable, and we perceive no error in the Director's determination to analyze the present case in terms of *Hughes.*