NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION,
Plaintiff,

v.

PRO–FOOTBALL, INC. d/b/a Washington
Redskins, et al., Defendants.

Civ. A. No. 93–2665.

United States District Court,
District of Columbia.

May 12, 1994.

Richard Ben–Veniste, Philip Katz, David A. Hickerson, Richard A. Berthelsen, Weil, Gotshal & Manges, Nat. Football League Players Ass'n, Washington, DC, for plaintiff.

Robert B. Cave, Peter W. Tredick, Mark J. Larson, Hogan & Hartson, Daniel L. Nash, James E. Conway, Akin, Gump, Strauss, Hauer & Feld, Washington, DC, for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The history of professional football is dotted with moments where last minute heroics produced stunning victories. For example, on December 28, 1958, with the score tied 17–17 in overtime, Johnny Unitas handed the ball to Alan ("the Horse") Ameche, who burst into the endzone to give the Baltimore Colts a championship victory over the New York Giants. This case presents the Court with the opportunity to address another type of last minute activity: a last minute legal battle that at one point threatened to stop the last game of the Washington Redskins' 1993 football season.

The parties in this suit seek to resolve a dispute arising out of the labor agreement governing the players and teams in the National Football League ("NFL"). The parties normally rely upon an arbitrator to act as a referee when disputes arise, but in this particular case, the Court is forced to don a black and white striped shirt and interpret the rules by which the parties have agreed to be bound. Having carefully considered the parties' cross-motions for summary judgment, the oral arguments of counsel, and the entire record in this case, the Court will grant the defendants' motions for summary judgment and dismiss this case.

1. Article V states:

Every NFL player has the option of joining or not joining the NFLPA; provided, however, that as a condition of employment commencing with the execution of this Agreement and for the duration of this Agreement and wherever and whenever legal: (a) any active player who is or later becomes a member in good standing of the NFLPA must maintain his membership in good standing in the NFLPA; and (b) any active player (including a player in the future) who is not a member in good standing of the NFLPA must, on the 30th day following the beginning of his employment or the execution of this Agreement, whichever is later, pay, pursuant to Section 2 below or otherwise to the NFLPA an annual service fee in the same amount as any initiation fee and annual dues required of members of the NFLPA.
CBA, Art. V, § 1.

## BACKGROUND

The facts in this case are undisputed. The plaintiff, the National Football League Players Association ("NFLPA"), is the union representing NFL players. The defendants are Pro–Football, Inc. d/b/a the Washington Redskins ("the Redskins") and the NFL Management Council ("Management Council"). The NFLPA and the NFL Management Council signed a collective bargaining agreement ("CBA") on May 6, 1993, that governs the employment of professional football players. In executing the CBA, the NFLPA acted as the sole and exclusive representative of the individuals who play football for NFL teams and the Management Council acted as the sole and exclusive representative of the NFL teams that employ these football players. CBA, Preamble.

Article V of the agreement contains a standard agency shop provision that requires NFL players to pay union dues or an equivalent service fee within 30 days of employment.[1] The agreement states that this provision is applicable "wherever and whenever legal." CBA, Art. V, § 1. If, after written notification to the NFL Management Council that a player has not paid the proper fees, the matter is not resolved within seven days, the agreement indicates that the player should be suspended without pay.[2] Additionally, Article V states that "[a]ny dispute over compliance with, or the interpretation, application or administration of this Article" will

2. With respect to notification, the CBA provides, in relevant part, that:

Upon written notification to the Management Council by the NFLPA that a player has not paid any initiation fee, dues or the equivalent service fee in violation of Section 1 of this Article V (Union Security), the Management Council will within seven days consider the matter. If there is no resolution of the matter within seven days, then the Club will, upon notification of the NFLPA, suspend the player without pay. Such suspension will continue until the NFLPA has notified the Club in writing that the suspended player has satisfied his obligation as contained in Section 1 of this Article V (Union Security). The parties hereby agree that suspension without pay is adopted as a substitute for and in lieu of discharge as the penalty for a violation of the union security clause of the Agreement and that no player will be discharged for a violation of that clause.
CBA, Art. V, § 6(a).

be resolved through arbitration. CBA, Art. V, § 6.[3] The resulting arbitration decision "will constitute full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this agreement." *Id.*

On December 17, 1993, the NFLPA sent a written notice to the Management Council which identified the players who had not paid dues or fees to the NFLPA for 1993. The Management Council then informed the Redskins that the team should suspend any players who failed to pay their fees or dues by December 24, 1993. On December 24, 1993, the NFLPA advised the Redskins that 37 Redskins players should be suspended for failing to pay the required fees. The Redskins refused to suspend the delinquent players, asserting that Virginia's right-to-work law prohibited the club from suspending the players.[4]

Based on the refusal of the Redskins to suspend the players, on December 24, 1993, the NFLPA then filed a grievance pursuant to the CBA and obtained an expedited hearing before an arbitrator, Herbert Fishgold. The arbitrator conducted a six-hour hearing on December 28, 1993. *See* Plaintiff's Exhibit G ("Transcript of Arbitration"). During the hearing, the Redskins argued that the club is a Virginia employer, subject to Virginia's right-to-work laws. Since the club's players spend the vast majority of their working hours at Redskins Park in Loudoun County, Virginia, the Redskins took the position that it would be illegal to enforce the agency shop provision against the Redskins

and the team's players. The NFLPA argued that the players' predominant job situs was in the District of Columbia and that Virginia's right-to-work law did not apply to the Redskins. Specifically, the NFLPA pointed out that the Redskins play two preseason and eight regular season games at Robert F. Kennedy Stadium ("RFK Stadium") in the District of Columbia, the club's revenue is predominantly derived from playing football games, and players' salaries are related to the number of games in which they remain on the club's roster.

On December 29, 1993, the arbitrator issued his finding. The arbitrator ordered the Redskins to comply with the agreement and to suspend players who failed to pay their dues or fees. Interpreting the Supreme Court's decision in *Oil, Chemical, and Atomic Workers, International Union v. Mobil Oil Corp.*, 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976), the arbitrator found that the District of Columbia, not Virginia, was the players' predominant job situs because the Redskins play more games there (at RFK stadium) than anywhere else. Plaintiff's Exhibit H at 6–7. Although the players spend the majority of their time practicing in Virginia, the arbitrator found that the team's games are the *"raison d'etre"* of the players' employment and produce the team's revenues.[5] *Id.* Therefore, the arbitrator issued an award that required the Redskins to suspend any players who failed to pay the proper fees. Plaintiff's Exhibit I.

On December 27, 1993, prior to the arbitration hearing, Terry Orr, a Redskins player

---

**3.** Article V specifically states that:

Any dispute over compliance with, or the interpretation, application or administration of this Article ... will be processed pursuant to Article IX (Non–Injury Grievance). Any decision of an outside arbitrator pursuant thereto will constitute the full, final and complete disposition of the dispute, and will be binding on the player(s) and Club(s) involved and the parties to this Agreement.

CBA, Art. V, § 6.

Article IX states that arbitration is the exclusive means of resolving disputes "involving the interpretation of, application of, or compliance with, any provision of the [CBA]" unless another form of dispute resolution is specifically set forth in the CBA. CBA, Art. IX, § 1. Since no other form of dispute resolution is applicable to the dispute between the parties in this case, arbitra-

tion was the appropriate means of dispute resolution.

**4.** Although § 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), permits employers to establish agency shops, § 14(b) of the Act, 29 U.S.C. § 164(b), allows states and territories to exempt themselves from § 8(a)(3) by enacting laws prohibiting agency shops. Such laws are commonly referred to as right-to-work laws. Virginia has enacted such a law. Va.Code Ann. § 40.1–62.

**5.** The arbitrator also relied on the fact that players' compensation is related to the number of games for which they appear on the Redskins roster. *Id.*

who is not a party to this suit, sought a temporary restraining order ("TRO") in the Circuit Court of Loudoun County, Virginia. Orr sought to enjoin the enforcement of the agency shop provision on the grounds that the provision was illegal under Virginia's right-to-work law. On December 30, 1993, Judge Thomas D. Horne granted the temporary restraining order and enjoined the Redskins from suspending Orr. *Orr v. National Football League Players Ass'n* No. 15460, 1993 WL 604063 (Va.Cir.Ct. December 30, 1993). Judge Horne interpreted *Mobil Oil* to mean that Virginia's right-to-work law applies to Orr and his teammates because the players spend the vast majority of their time in Virginia. *Id.* at *2.[6]

Following Judge Horne's action, the NFLPA filed this suit seeking injunctive relief and a TRO ordering the defendants to comply with the arbitration award. The NFLPA sought to have the players suspended prior to the Redskins' December 31 game against the Minnesota Vikings. Judge Joyce Hens Green denied the motion on December 30, 1993. *National Football League Players Ass'n v. Pro–Football, Inc.*, 849 F.Supp. 1, (D.D.C.1993). Judge Green found that the NFLPA was unable to demonstrate a substantial likelihood of success on the merits. Additionally, Judge Green expressed concern that granting the TRO could cause the Redskins to forfeit the December 31 game, the only NFL game scheduled to be broadcast on New Year's Eve. Such a result would harm ticket holders, fans planning to watch or listen to the game in the mass media, and the teams that were still competing for a berth in the NFL playoffs. *Id.* at 2.

Although the 1993 NFL season is over, the parties have pursued this matter. The Redskins have filed a counterclaim against the NFLPA seeking a declaratory judgment finding the arbitrator's award to be unlawful and unenforceable. The NFLPA filed a motion for summary judgment and the defendants have filed cross-motions for summary judgment. The Court heard oral arguments on these motions on April 21, 1994.

## DISCUSSION

In this case, the Court needs to determine whether the Redskins can make an end run around the arbitrator's decision. In order to make such a determination, the Court needs to address two issues: (1) the standard of review to apply; and (2) whether the arbitrator correctly interpreted *Mobil Oil* when he found the job situs of Redskins players to be the District of Columbia. The Court finds that it is required to act much like the mysterious individual in the NFL's instant replay booth and review the prior decision *de novo*. After conducting a slow-motion *de novo* review of the arbitrator's decision, the Court finds that the arbitrator incorrectly interpreted *Mobil Oil*. Accordingly, the Court finds that the defendants are entitled to summary judgment.

## I. The Appropriate Standard for Reviewing the Arbitrator's Decision

Under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185, federal courts have jurisdiction to enforce collective bargaining agreements. *Local Union 1395, Int'l Brotherhood v. N.L.R.B.*, 797 F.2d 1027, 1030 (D.C.Cir.1986). The parties do not dispute that this Court has jurisdiction to review and enforce the arbitrator's decision. However, the parties dispute the level of deference that the Court should give to the arbitrator's decision.

The defendants start out in the position of a football team that is behind on the scoreboard and buried in its own territory with less than a minute to play. They face a difficult challenge because ordinarily, "a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be a better one." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983). This rule makes sense because parties who choose to have a dispute resolved by an arbitrator should not then be able to go into federal court and seek to reject the

---

**6.** In response to Judge Horne's ruling, the arbitrator amended his prior award and excluded

Orr from the list of players whom the Redskins should suspend. Plaintiff's Exhibit M.

interpretation for which the parties bargained. Much like a referee's pass interference call, the key is not necessarily the correctness of the decision, but its finality. Without a final resolution of the matter, play cannot proceed.

In order to keep the game of labor-management relations going, courts ordinarily defer to arbitrator's decisions. The arbitrator's award is legitimate so long as it "draws its essence from the collective bargaining agreement," but may be set aside if it does not draw its essence from the agreement. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). A mere ambiguity in the arbitrator's decision is not adequate to demonstrate that the arbitrator exceeded his or her authority *Id.* at 597–98, 80 S.Ct. at 1361. In fact, the scope of judicial review of an arbitrator's decision is the "narrowest known in the law." *Southern Pacific Transp. Co. v. United Transp. Union*, 789 F.Supp. 9, 13 (D.D.C.1992).

Undaunted by this field position, the defendants' first play is to argue that the arbitrator's award is not legitimate because it did not draw its essence from the collective bargaining agreement. This argument does little to advance the defendants toward the end zone. An award fails to draw its essence from a contract if it is "based on external legal sources, wholly without regard to the terms of the parties' contract." *American Postal Workers Union v. United States Postal Service*, 789 F.2d 1, 8 (D.C.Cir.1986). Here, the arbitrator looked to external legal sources, but did so only in order to interpret the "wherever and whenever legal" provision of the collective bargaining agreement. Since the arbitrator did not look directly to external legal sources, but did so in order to interpret a provision of the agreement, the arbitrator's decision in fact draws its essence from the agreement. *See United States Postal Service v. National Ass'n of Letter Carriers*, 789 F.2d 18, 20 (D.C.Cir.1986) (per curiam) (arbitrator's decision drew essence from collective bargaining agreement when arbitrator looked to Tennessee statute pursuant to language in agreement requiring management's decisions to be consistent with ap-

plicable law). Thus, this argument fails to gain any yardage for the defendants.

The defendants' next challenge to the arbitrator's decision also falls short—an incomplete pass. The defendants argue that the arbitrator's decision concerning the meaning of the term "wherever and whenever legal" in the CBA merits no deference because the arbitrator implausibly and incorrectly interpreted the Supreme Court's *Mobil Oil* decision. The District of Columbia Circuit has indicated that it would not disturb an arbitrator's plausible reading that a contract incorporated state law. *National Ass'n of Letter Carriers*, 789 F.2d at 20. The defendants argue that such deference is not appropriate here because the arbitrator's award was implausible.

Even assuming that the arbitrator's interpretation of *Mobil Oil* was incorrect, it was not implausible. The arbitrator based his decision on the fact that football games are the *"raison d'etre"* of the relationship between the Redskins and the team's players. The arbitrator drew this French phrase directly from Justice Marshall's majority opinion. Although the French may not know much about American football, the arbitrator's reliance on the phrase in making his decision was not implausible; he drew directly upon language in a Supreme Court decision. Thus, as the defendants return to the huddle, their prospects for victory look bleak.

The defendants next turn to the "Hail Mary" of challenges to an arbitrator's decision, public policy. Decisions of arbitrators are given deference even if the arbitrator makes errors of fact and law, unless the arbitrator's award "compels the violation of law or conduct contrary to accepted public policy." *Washington–Baltimore Newspaper Guild, Local 35 v. The Washington Post Company*, 442 F.2d 1234, 1239 (D.C.Cir.1971) (quoting *Gulf States Telephone Company v. Local 1692, International Brotherhood of Electrical Workers*, 416 F.2d 198, 201 (5th Cir.1969)). This is consistent with the Supreme Court's statement that "a court may not enforce a collective-bargaining agreement that is contrary to public policy." *W.R. Grace & Co.*, 461 U.S. at 766, 103 S.Ct. at

2183. In determining whether a clear policy exists, courts look to "the laws and legal precedents" not "general considerations of supposed public interests." *Id.* (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). Such public policy arguments, much like Hail Mary passes, are usually unsuccessful.

Despite the difficulty of creating a successful public policy argument, the defendants present a credible claim based upon the law of Virginia. The Virginia Code states that "[i]t is hereby declared to be the public policy of Virginia that the right to work shall not be denied or abridged on account of membership or nonmembership in any labor union or labor organization." Va.Code Ann. § 40.1–58. Section 40.1–62 of the Virginia Code prohibits employers from requiring employees to pay union dues or similar fees to labor unions. A violation of this prohibition is a misdemeanor. *Id.* § 40.1–69. If these laws apply to the Redskins, enforcing the agency shop provision of the CBA would violate Virginia's law and public policy.

The difficulty presented by the defendants' argument is that it is intertwined with the merits. If the arbitrator was correct in finding that the players' job situs is the District of Columbia, the Court should defer to his award because it does not violate Virginia's public policy. However, if the arbitrator was incorrect, the Court should not defer to the award because it violates Virginia's public policy. The only reasonable way to determine the amount of deference to give to the arbitrator is to review the merits of the arbitrator's decision to determine whether he made an error of law that compels the defendants to violate Virginia law and public policy. This is the route that the District of Columbia Circuit took in *Washington Post v. Washington–Baltimore Newspaper Guild, Local 35,* 787 F.2d 604, 606 (D.C.Cir.1985). In that case, the plaintiff challenged a remedy ordered by an arbitrator on the grounds that it violated a provision of the Labor Management Relations Act, 29 U.S.C. § 186. The *Washington Post* court recognized that arbitrator's awards are normally entitled to significant deference, but noted that deference is not appropriate where an award contemplates a violation of law. It stated that in circumstances where legal interpretation is necessary, "we are informed by the views of the arbitrator . . ., but we approach the task with an awareness that the final responsibility is solely our own." 787 F.2d at 606. The Court went on to interpret the statute and found that the arbitrator's award was lawful. *Id.* at 609. Guided by this precedent, the Court will not punt this issue to the arbitrator, but will follow the same course as *Washington Post* and review the merits of the arbitrator's decision *de novo* in order to determine whether or not it compels a violation of Virginia law. By articulating a credible public policy argument, the defendants have completed their Hail Mary pass.[7] Nevertheless, to win the game by succeeding on the merits, the defendants must persuade the Court that the arbitrator incorrectly interpreted *Mobil Oil.*

## II. Determining the Job Situs of Redskins' Players Under *Mobil Oil*

An analysis of the arbitrator's decision must start with the United States Supreme Court's decision in *Mobil Oil.* In *Mobil Oil,* an oil company filed a lawsuit seeking to invalidate an agency shop provision in its CBA with unlicensed seamen who worked on its oil tankers. 426 U.S. at 410, 96 S.Ct. at 2142. The company argued that the provision was invalid because it violated Texas' right-to-work laws. *Id.* The sole issue before the Supreme Court was whether the right-to-work laws of Texas could void the agency shop provision of the CBA. *Id.* This determination involved an interpretation of §§ 8(a)(3) and 14(b) of the National Labor Relations Act.[8] In examining the issue, the

---

7. The success of a public policy argument in this circumstance is not unlike Franco Harris' Immaculate Reception during an AFC playoff game on December 23, 1972. With only 22 seconds remaining in the game, Harris caught Terry Bradshaw's desperation fourth-down pass just before it struck the ground and ran for a touchdown to give the Pittsburgh Steelers a remarkable victory over John Madden's Oakland Raiders. While such plays do occur, they are quite rare.

8. These provisions of the Act are discussed *supra* at footnote 4.

Court considered three possible methods for evaluating the contacts between the state and the employment relationship: (1) applying the law of the employee's principal job situs; (2) evaluating the whole employment relationship to determine whether a state had sufficient contacts with the employment relationship; and (3) applying the law of the jurisdiction where the hiring process took place. *Id.* at 413–14, 96 S.Ct. at 2144. The Court held that:

> In light of what we understand Congress' concerns in both § 8(a)(3) and § 14(b) to have been, we conclude that it is the employees' predominant job situs rather than a generalized weighing of factors or the place of hiring that triggers the operation of § 14(b). We hold that under § 14(b), right-to-work laws cannot void agreements permitted by § 8(a)(3) when the situs at which all the employees covered by the agreement perform most of their work is located outside of a state having such laws.

*Id.* at 414, 96 S.Ct. at 2144. Because most of the employment work of the seamen was performed on the high seas, the Court found that Texas' right to work laws did not apply to them. *Id.* at 420, 96 S.Ct. at 2146.

In the course of reaching its conclusion, the Court rejected the tests that would require courts to evaluate contacts or look to the location of the hiring process. For example, the Court rejected the latter test because § 14(b) addressed concerns related to the post-hiring employment relationship, not the hiring process. *Id.* at 417, 96 S.Ct. at 2145. In emphasizing that § 14(b) is concerned with the post-hiring relationship as opposed to the place of hiring, the Court stated that:

> "It is evident, then, that § 14(b)'s primary concern is with state regulation of the post-hiring employer-employee-union relationship. And the center of the *post*-hiring relationship is the job situs, the place where the work that is the very *raison d'etre* of the relationship is performed."

*Id.* (emphasis in original).

The Court went on to explain that two practical concerns supported its decision to adopt a rule that an employee's predominant job situs should determine the applicability of

state right-to-work laws: (1) the rule minimizes the possibility of "patently anomalous extra-territorial applications" of right-to-work laws and (2) the rule provides an easy and predictable method of determining whether an agency shop provision will apply. *Id.* at 419, 96 S.Ct. at 2146.

The parties in this case seize upon different language in *Mobil Oil* to support their positions. The NFLPA argues that the arbitrator correctly relied upon the *raison d'etre* language because of the unique employment status of professional athletes. Despite their lengthy practices, the real purpose of their work is to play in football games. Since more of the Redskins' games are played at RFK Stadium than any place else, the NFLPA reasons that the District of Columbia is the predominant job situs of the Redskins players. The defendants argue that the arbitrator fumbled his interpretation of *Mobil Oil* by taking the *raison d'etre* language out of context. According to the defendants, *Mobil Oil* creates a quantitative test. Because the Redskins players spend most of their time in Virginia, not the District of Columbia, the defendants assert that Virginia is the players' predominant job situs and that its right-to-work law should apply to the Redskins players.

A review of the *Mobil Oil* decision and the few cases interpreting it convince this Court that the arbitrator's decision was erroneous. The *raison d'etre* language appears only once in the *Mobil Oil* opinion. It arises only in the context of the Supreme Court's explanation of why, under § 14(b), the post-hiring employment relationship was more significant than the location where the hiring process took place. Contrary to the arbitrator's interpretation, the Supreme Court did not use this phrase as a means of defining the term "predominant job situs." By treating the passing use of the term *raison d'etre* as the definition of "predominant job situs," the arbitrator read the term out of its appropriate context and gave it a significance that the Supreme Court had not intended. Nothing in the case suggests that the Supreme Court intended an employee's predominant job situs to be the place that is the *raison d'etre* of his or her employment, as opposed to the

place where the employee spends the most time.

This can be clearly seen by examining the manner in which the Supreme Court determined the predominant job situs of the seamen in *Mobil Oil*. When the Supreme Court applied its new test in *Mobil Oil*, it made no reference to the *raison d'etre* of the seamen's employment, but only referred to the place where most of the work was performed. 426 U.S. at 420, 96 S.Ct. at 2146–47. Because the seamen spent most of their time on the high seas, the Court had little difficulty finding that Texas' right-to-work laws did not apply to the seamen. *Id.* A full reading of the *Mobil Oil* opinion can only lead to the conclusion that the Supreme Court adopted a quantitative test for determining an employee's predominant job situs.

The few cases that have interpreted and applied the *Mobil Oil* test provide no additional support for the arbitrator's novel interpretation of *Mobil Oil*. These cases tend to discuss whether state right-to-work laws apply on federal property. The rule that can be gleaned from these cases is that the applicability of right-to-work laws will depend on whether the employees spend most of their time on property that is exclusively federal. *See Lord v. Local Union No. 2088, Int'l Brotherhood of Electrical Workers*, 646 F.2d 1057 (5th Cir.1981) (Florida right-to-work law not applicable to areas over which federal government had exclusive jurisdiction), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3483, 73 L.Ed.2d 1366 (1982); *International Ass'n of Machinists and Aerospace Workers v. Dyncorp*, 796 F.Supp. 976 (N.D.Tex.1991) (Texas right-to-work laws applicable to Air Force base when employees spent over 90 percent of their time on land over which the state had concurrent jurisdiction); *Vincent v. General Dynamics Corp.*, 427 F.Supp. 786 (N.D.Tex.1977) (Texas right-to-work laws not applicable to Air Force plant where most of plant was federal enclave and over 97 per-

cent of employees worked in portion that was federal enclave).[9] None of these cases discusses the *raison d'etre* language of the *Mobil Oil* opinion or attempts to determine the *raison d'etre* of the employment relationship in question. Instead, the cases tend to perform quantitative evaluations of where the employees spend the majority of their time. In fact, the *Vincent* court specifically refers back to the goals of *Mobil Oil* and states:

> Relying on the Supreme Court's statement of federal labor policy in *Mobil Oil*, and on the insistence of the majority therein in formulating a practical and predictable test for the sake of certainty in bargaining procedure, the Court is of the opinion that the law of the federal enclave whereon the vast majority of employees work and the vast majority of facilities and building space are located should control the entire contract.

*Id.* at 799. The arbitrator did not refer to these other cases and relied solely upon the *raison d'etre* language of the *Mobil Oil* opinion. In so doing, the arbitrator apparently ignored the remaining text of *Mobil Oil*, as well as the cases applying its holding. In short, the arbitrator dropped the ball.

The two judges who have already considered the matter have disagreed with the arbitrator's analysis. In granting a TRO in favor of Terry Orr, Judge Horne of the Loudoun County Circuit Court rejected the arbitrator's interpretation of *Mobil Oil* and found that because Terry Orr spends over 90 percent of the time required to perform his contract in Virginia, Virginia is his predominant job situs. *Orr*, 1993 WL 604063 at *2. The NFLPA tries to distinguish Judge Horne's holding because Orr did not actually play any games in the District of Columbia in 1993. While this may be true, it was simply not a factor that was addressed in Judge Horne's opinion and did not affect Judge Horne's analysis.[10] Judge Joyce Hens Green

---

**9.** Another case, *King v. Gemini Food Serv., Inc.*, 438 F.Supp. 964 (E.D.Va.1976), *aff'd*, 562 F.2d 297 (4th Cir.1977), *cert. denied*, 434 U.S. 1065, 98 S.Ct. 1242, 55 L.Ed.2d 766 (1978), discusses whether the Virginia right-to-work law should apply to a food services operation on federal

property, but does not decide whether the law applies.

**10.** The Court notes that Judge Horne recently refused to dismiss Terry Orr's lawsuit as moot. Additionally, several current Redskins players have joined as plaintiffs in Orr's ongoing lawsuit.

denied the plaintiff's motion for a TRO for substantially the same reasons stated by Judge Horne and stated that the facts in Orr's case were equally applicable to the other Redskins who spend most of their time practicing at Redskins Park. The Court recognizes that it need not give any weight to these preliminary determinations because they are neither law of the case nor *res judicata. Community Nutrition Institute v. Block,* 749 F.2d 50, 56 (D.C.Cir.1984). Without giving these decisions any substantive weight, the Court notes that these decisions suggest that today's ruling is not based on a wholesale reinterpretation of existing law.

Because the NFLPA has little relevant authority to support its position, it attempts a misdirection play by directing the Court's attention to a District of Columbia Court of Appeals decision in which some Redskins players were found to be covered by the District of Columbia's Workers' Compensation Act, *Pro–Football, Inc. v. District of Columbia Dep't of Employment Servs.,* 588 A.2d 275 (D.C.1991). In *Pro–Football,* the Court was asked to determine whether the District of Columbia's Department of Employment Services was clearly erroneous when it applied a test that sought to determine the place "from which the employee performs the principal service(s) for which he was hired." *Id.* at 278 (citing *Hughes v. District of Columbia Dep't of Employment Servs.,* 498 A.2d 567 (D.C.1985)). Applying that standard, the Court found that the Department had not been clearly erroneous in finding that players who had actually played football games at RFK Stadium were subject to District of Columbia law.[11] *Id.* at 279.

If this Court were applying the same test in this case, it conceivably could reach the same result. However, *Mobil Oil* did not establish a "principal services" test, but a "predominant job situs" test based upon where an employee spends most of his or her time. 426 U.S. at 414, 96 S.Ct. at 2143–44.

The *Pro–Football* case specifically noted that the Redskins players spend the majority of their time in Virginia, but found that the players' principal services were performed in the District of Columbia. 588 A.2d at 278–79. The factual findings in *Pro–Football* thus support a finding that the predominant job situs of the players under the quantitative *Mobil Oil* test is Virginia. Accordingly, the *Pro–Football* case provides no relevant guidance for interpreting *Mobil Oil* and does nothing to support the NFLPA's position.

It appears that the arbitrator simply misread *Mobil Oil.* The Supreme Court was concerned with developing a workable test and rejected the use of a flexible balancing test. Nevertheless, at the arbitration hearing, the parties presented evidence that attempted to establish the contacts between the Redskins and the District of Columbia. The NFLPA presented evidence showing that the Redskins' revenues come predominantly from football games and that the players' contracts were linked to game performance. Transcript of Arbitration at 110–122. The NFLPA also tried to support its position by demonstrating that the Redskins' fight song includes the phrases "sons of Washington" and "Fight on for old D.C." *Id.* at 225–26.[12] The mere fact that such evidence was presented suggests the folly of adopting the arbitrator's *raison d'etre* test. It would present a clear risk of creating a flexible and nebulous test despite the Supreme Court's pronouncement that a bright line test is appropriate. *Mobil Oil,* 426 U.S. at 418–19, 96 S.Ct. at 2145–46.

It is true that the Redskins would not exist if the team did not play its games in the District of Columbia and elsewhere. The team's revenue comes primarily from playing games, not practicing. However, to adopt an economic-based *raison d'etre* test would potentially create difficulties in application. Professional athletes, musicians, actors, and

It is thus too early to know whether the Virginia matter will produce a result consistent with Judge Horne's earlier ruling.

11. The Court remanded the cases of players who never actually played in a game at RFK Stadium. *Id.*

12. Apparently, "Fight on for old D.C." was a change from the original phrase "Fight on for old Dixie." *Id.* While such information makes for good cocktail party conversation, it does nothing to demonstrate the Redskins players' predominant job situs under *Mobil Oil.*

others who may spend most of their time in one place practicing, but earn their revenue based upon a limited number of performances, would face the possibility that the application of agency shop provisions may vary from year to year depending on the location of their performances in a given year. Further, the Redskins themselves may be presented with situations where players are under contract but do not play in the District of Columbia at all because of injuries or some other concerns. If a player does not participate in a single game in the District of Columbia (e.g.—Terry Orr), the player could possibly be subject to Virginia's right-to-work laws, because the *raison d'etre* would be different. This could create the anomalous situation in which players on the same team would be covered by the labor laws of different jurisdictions. This is not the type of situation envisioned by the Supreme Court when it adopted the job situs test.

The Court's primary concern must be with predictability. The NFLPA may have some legitimate equitable arguments about the financial significance of the games that are played in the District of Columbia, as opposed to the practices that occur in Virginia. Nevertheless, when the Redskins players get up in the morning to go to work, they usually go to Redskins Park, not RFK stadium. Practices, conditioning, and meetings are an integral part of game preparation. Since the players spend most of their time working in Virginia, *Mobil Oil* indicates that Virginia law should apply to them. Regardless of the intuitive appeal of the arbitrator's decision, it does not conform with the current state of the law. Carving out exceptions to *Mobil Oil* for the Redskins (and eventually others) would limit the predictability and usefulness of *Mobil Oil.*

Because the arbitrator in this case clearly erred in interpreting *Mobil Oil,* he placed the Redskins in the unenviable position of being ordered to violate the law and public policy of Virginia. Although the Court is ordinarily quite reluctant to act as a Monday morning quarterback and second-guess an arbitrator, public policy mandates that the Court step in and act in this particular case. The Court finds that the arbitrator's decision violated the law and public policy of Virginia and therefore cannot stand. Thus, although the team has struggled recently on the gridiron, the Redskins have won a surprising come-from-behind victory here in the judicial arena.

## CONCLUSION

For the foregoing reasons, the Court finds that this case presents no genuine issue of material fact and that the defendants are entitled to a judgment as a matter of law pursuant to Fed.R.Civ.P. 56. Therefore, the Court will vacate the arbitrator's award and enter a declaratory judgment finding that the award is unenforceable because it is contrary to the laws and public policy of Virginia. Accordingly, the Court will grant the defendants' motions for summary judgment, deny the plaintiff's motion for summary judgment, and dismiss this case.